UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

EXCEPTIONAL URGENT CARE CENTER I,
INC., a Florida corporation,

          Plaintiff,

v.                                                    Case No. 5:08-cv-284-Oc-10GRJ

PROTOMED MEDICAL MANAGEMENT
CORPORATION, a foreign corporation,

          Defendant.
_____/

## REPORT AND RECOMMENDATION[1]

Pursuant to the Court's May 14, 2009 Order (Doc. 25), Defendant's Motion to Dismiss, Or, in the Alternative, Motion to Transfer Venue (Doc. 7) was referred to the undersigned to determine whether Plaintiff is bound by the forum selection clause that is incorporated in the End User License Agreement ("EULA"). An evidentiary hearing was held to address this issue on May 28, 2009, and the matter is now ripe for resolution. For the reasons discussed below, it is recommended that Defendant's Motion to Dismiss be **DENIED** but that Defendant's Alternative, Motion to Transfer Venue (Doc. 7) be **GRANTED**.

## I. BACKGROUND & FACTS

Defendant, ProtoMed Medical Management Corporation ("ProtoMed") is a Maryland corporation that designs, manufactures, and sells a "computer software

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

program utilized by health care practitioners to manage billing claims submitted to private insurance carriers and Medicare" ("ProtoMed Software").[2] ProtoMed also provides software support services and unlimited claims processing to its end users in exchange for an annual fee. Plaintiff, Exceptional Urgent Care Center I, Inc., ("Exceptional Urgent Care") is a Florida corporation engaged in providing urgent medical care services. The following is a brief summary of the evidence presented during the evidentiary hearing.[3]

In approximately May 2006, Dr. John Im, the owner of Exceptional Urgent Care, began negotiating on behalf of Plaintiff with Bruce Fox[4] in an effort to purchase an "Electronic Health Records" system.[5] Even though ProtoMed only sells billing software, and not computer hardware, the system proposed by Mr. Fox apparently included both hardware and Defendant's software. Dr. Im testified that at some point thereafter, Mr. Fox presented Dr. Im with a document entitled "Master Sales Agreement."[6] According to Dr. Im, Mr. Fox told Dr. Im not to sign the Master Sales Agreement because it was "lopsided." Dr. Im admitted that he did not read the document nor present it to an

---

[2] *See* Plaintiff's Amended Complaint, Doc. 29 ¶ 7.

[3] The evidence presented during the hearing included several documents (Plaintiff's Exhibits #1, 2, 5-7; Defendant's Exhibits #1-6) and the testimony of two witnesses: Lawrence Walsh, Defendant's CEO; and Dr. John Im, Plaintiff's President.

[4] Bruce Fox was the Defendant's national sales manager when he initiated contact with Plaintiff. However, by October 2006, Mr. Fox was no longer employed by Defendant and was, instead, an independent reseller of Plaintiff's software.

[5] Plaintiff's Composite Exhibit #1.

[6] Dr. Im testified that Plaintiff's Composite Exhibit #6, which is dated in February 2008, is not the actual document Mr. Fox presented to him. While transitioning between office locations, Dr. Im lost the original. In late 2007, Dr. Im requested a copy of the agreement from Mr. Fox and Plaintiff's Composite Exhibit #6 is the document Mr. Fox produced.

attorney for review. Further, Dr. Im testified that he could not recall whether he ever saw the entire agreement—including but not limited to the End User License Agreement ("EULA"), one of several documents the Master Sales Agreement lists as an "addendum" and incorporates by reference. As a result of Mr. Fox's representations that the Master Sales Agreement was "lopsided," Dr. Im refused to sign it.

Exceptional Urgent Care eventually purchased the software and computer hardware from Mr. Fox who subsequently arranged for Mr. Walsh, the CEO of ProtoMed, to travel from Maryland to Plaintiff's office in Marion County from October 10 through October 12, 2006 to set up the ProtoMed Software and to train Plaintiff's staff. Prior to Mr. Walsh's arrival, the ProtoMed Software was delivered—but not installed—electronically. During the time Mr. Walsh was in Plaintiff's office installing the software and conducting extensive training on the software, he interacted primarily with Plaintiff's office manager, Rebecca Larios.

The EULA is at the center of the matter currently before the Court. According to the first paragraph of the EULA, installation and use of the software constitutes acceptance of all of the EULA's terms—including a forum selection clause mandating Maryland as the forum for any dispute arising out of or relating to the EULA. The EULA is provided to all of ProtoMed's end users in a variety of formats.

First, it appears as a "click agreement"[7] in a pop up window during the installation of the software. Mr. Walsh testified that it is impossible to install the ProtoMed Software

---

[7] Click agreements are valid agreements governed by ordinary principles of contract law that typically require a computer user to read the agreement on the computer's monitor and click "I accept" before proceeding to the next screen and/or obtaining additional information. Salco Distributors, LLC v. iCode, Inc., No. 8:05-cv-642-T-27TGW, 2006 WL 449156, at *2 n.5 (M.D. Fla. Feb. 22, 2006).

without clicking to accept the terms of the EULA. Mr. Walsh testified that he made Ms. Larios aware of the pop up window containing the click agreement version of the EULA and, at that time, he explained to her what the EULA was and where she could find it later. Ms. Larios did not object and assented to Mr. Walsh clicking "yes" to accept the EULA to begin the installation of the software.

The EULA was also made available to its end users in hard copy. ProtoMed sent a copy of the EULA to all of its end users on two occasions. According to Mr. Walsh, a copy of the EULA accompanied ProtoMed's annual bill at the beginning of 2007. The second hard copy of the EULA was also sent via facsimile at the end of March 2008.

Although there is no evidence other than Mr. Walsh's testimony that a copy of the EULA was included with the annual bill, it is undisputed that Plaintiff received and paid ProtoMed's annual fee without objection. According to Dr. Im, he first learned of the EULA at the beginning of April 2008 when he received ProtoMed's facsimile.

Finally, the EULA is also integrated into the ProtoMed Software and is readily accessible from the software's help menu. During his training of Plaintiff's staff, Mr. Walsh testified that he informed Ms. Larios that a copy of the EULA resides on the software and demonstrated how to access it. Plaintiff began using the software immediately after it was installed and continued to use it until at least February 2008.

### *Procedural History*

Plaintiff originally filed this action in the Circuit Court of the Fifth Judicial Circuit in and for Marion County, Florida alleging claims for breach of warranty and breach of oral contract arising out of Plaintiff's purchase of allegedly defective software from Defendant. Defendant subsequently removed this matter to this Court based upon

diversity jurisdiction.[8] Defendant filed the instant motion seeking dismissal of Plaintiff's Complaint pursuant to Rule 12(b)(3), which permits dismissal, at the discretion of the Court, for improper venue.[9] In the alternative, Defendant requests that the Court transfer the case to the United States District Court for the District of Maryland, pursuant to 28 U.S.C. §1404(a).

After the evidentiary hearing - and in an apparent attempt to thwart enforcement of the forum selection clause at issue - Plaintiff filed an Amended Complaint (Doc. 29) identical to the original complaint other than the addition of a claim for violation of Florida's Deceptive And Unfair Trade Practices Act.[10]

## II. **DISCUSSION**

### A. *Transfer of Venue And Not Dismissal Is The Appropriate Remedy*

Because Defendant's motion is premised upon enforcement of the forum selection clause in the End User License Agreement ("EULA")—and not upon any other defect in venue—the Court must first determine whether Defendant's challenge to venue should be analyzed as a motion to dismiss for improper venue under Rule 12(b)(3) of the Federal Rules of Civil Procedure, or analyzed as a request for transfer of venue under 28 U.S.C. § 1404(a). This distinction is not merely academic. Although the Court must determine the effect of the forum selection clause under either analysis, the forum selection clause is the sole focus of the analysis under Rule 12(b)(3), while there are other factors the Court must also consider under a § 1404(a) analysis. In addition,

---

[8] 28 U.S.C. § 1332.

[9] FED. R. CIV. P. 12(b)(3).

[10] Doc. 29.

5

the EULA—if found to be valid and enforceable—may present a statute of limitations problem if this matter is dismissed pursuant to Rule 12(b)(3).[11] Accordingly, the Court will first address whether Rule 12(b)(3) or § 1404(a) controls Defendant's request to enforce the forum selection clause in the EULA.

Relying upon *Lipcon v. Underwriters at Lloyd's, London*,[12] Defendant argues that motions to dismiss upon the basis of forum selection clauses are cognizable as motions to dismiss for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure. While the Defendant is correct that the Court in *Lipcon* permitted the defendant to proceed under Rule 12(b)(3), the *Lipcon* Court did so primarily for the reason that the forum selection clause, there, specified England, a foreign venue, as the chosen forum. In *Lipcon*, the Eleventh Circuit properly observed that "the federal statutory provisions governing transfer of venue from one United States District Court to another . . . do not apply in cases that involve a forum selection clause that requires litigation in another *country*."[13] As Defendant candidly concedes in its brief, the Eleventh Circuit has not had an opportunity after *Lipcon* to consider whether Rule 12(b)(3) applies when the forum selection clause mandates a domestic forum. However, most federal trial courts that have confronted the issue since *Lipcon* have limited *Lipcon*'s

---

[11] Paragraph 7 of the EULA provides in relevant part, "No action or claim relating to this EULA or the Software may be instituted more than one (1) year after the event giving rise to such action or claim." (Doc. 5 p. 26.)

[12] 148 F. 3d 1285, 1290 (11th Cir. 1998).

[13] Id. at 1290 n.3.

rationale to cases where the contractual choice of forum is a foreign venue and, therefore, a transfer pursuant to 28 U.S.C. § 1404(a) is unavailable.[14]

Thus, the Court concludes that the holding in *Lipcon* is limited to situations involving a contractual forum selection clause designating a *foreign* forum as the proper venue – a situation where the Court cannot enforce the forum selection clause through a transfer of venue. However, where, as here, the contractual forum selection clause designates a domestic forum, the appropriate procedural mechanism for enforcing the forum selection clause is 28 U.S.C. § 1404(a). Accordingly, to the extent that the Defendant requests that the Court dismiss the action for improper venue under Rule 12(b)(3) the request is due to be **DENIED**.

### B. *The Forum Selection Clause Is Valid and Enforceable*

Central to the parties' respective arguments is whether the EULA—and more specifically, the forum selection clause in the EULA—is enforceable. Plaintiff argues that it is not bound by the terms of the EULA because Dr. John Im, Plaintiff's President, effectively rejected the EULA when he refused to sign a Master Sales Agreement which incorporated the EULA by reference as an addendum.

Plaintiff's argument is unpersuasive for several reasons. First, as Mr. Walsh correctly pointed out the Master Sales Agreement only is used where the sale is made

---

[14] *See, e.g.*, Vickers v. Wells, No. 105CV0930RWS, 2006 WL 89858, at *2 n.1 (N.D. Ga. Jan. 11, 2006); D/H Oil & Gas Co. v. Commerce & Indus. Ins. Co., No. 3:04-cv-448-Rv/MD, 2005 WL 1153332, at *3 (N.D. Fla. May 9, 2005) (Vinson, J.); Exprezit Convenience Stores, LLC v. Transaction Tracking Tech., Inc., No. 3:05CV12/MCR, 2005 WL 2704891, at *3 (N.D. Fla. Oct. 19, 2005) (Rogers, J.); Digital Envoy, Inc. v. Google, Inc., 319 F. Supp. 2d 1377, 1378-79 (N.D. Ga. 2004) ("In cases since *Lipcon*, courts in the Eleventh Circuit have generally assumed that its rule applies only where transfer is impossible because the forum selection clause requires litigation in a foreign country."); *see also* Consol. Mgmt. Solutions, Inc. v. Dennis, No. 3:07-cv-1192-J16-MCR, 2008 WL 2694107 (M.D. Fla. July 7, 2008).

7

directly to a customer and not, as here, where the sales was made by a reseller, like Mr. Fox. Secondly, Dr. Im never testified that he rejected the EULA, a document which is supposed to be attached as an exhibit to the Master Sales Agreement. Rather, Dr. Im testified that Bruce Fox presented him with "something like" Plaintiff's Composite Exhibit #6 prior to the installation of the software at Plaintiff's office in October 2006. Notably, Dr. Im did not recall reading the document in its entirety, did not recall whether the EULA was attached, and he did not have an attorney review it for him. Moreover, Dr. Im explained that although Bruce Fox presented him with a copy of a document entitled Master Sales Agreement prior to Plaintiff's purchase of the software, Dr. Im was unable to locate the actual document. The document that Dr. Kim referred to at the hearing, was a copy he received from Bruce Fox, dated February 10, 2008, which Mr. Fox generated sixteen months after the software had been installed. Most notably, the document Dr. Im viewed at the hearing did not have a copy of the EULA attached. Dr. Im testified that he first saw the EULA when it was faxed to his office in April 2008. As such, there is no evidence that Dr. Kim affirmatively rejected the EULA itself. At best - and giving Dr. Im the benefit of the doubt - the evidence demonstrated that Dr. Im refused to sign "something like" Plaintiff's Composite Exhibit #6. Accordingly, even if Dr. Im's refusal to sign a Master Sales Agreement is viewed as a rejection of the Master Sales Agreement, it would not be a rejection of the EULA, which apparently Dr. Im never viewed and which was not even attached to the agreement Dr. Im refused to sign.

The discussion of whether there was or was not a rejection of the Masters Sales Agreement is, however, largely academic in view of the fact that the EULA itself as the

8

licensing agreement for the software is binding independent of the validity of the Master Sales Agreement.

That is so because there was unrefuted evidence offered at the hearing demonstrating that the EULA was presented to Plaintiff independent of the Master Sales Agreement on at least three occasions—as a click agreement, in hard copy, and via the copy which is contained in the software itself and is readily accessible via the help menu.

With regard to the click agreement version of the EULA, Lawrence Walsh testified that the ProtoMed Software was electronically delivered to Plaintiff's office—but the software was not installed until he arrived to conduct the initial set up and staff training on October 10, 2006. Plaintiff's office manager, Rebecca Larios, was the representative for the Plaintiff who personally met with Mr. Walsh, went through each of the aspects of the operation of the software - over a three day period of time - and who signed all of the training and installation documentation affirmatively acknowledging on behalf of the customer that each aspect of the software had been installed and the customer trained on each aspect.[15] According to Mr. Walsh, because assent to the click agreement is a prerequisite to installation of the software, he expressly explained the EULA to Ms. Larios, who Mr. Walsh understood to be the office manager. Mr. Walsh testified that Ms. Larios watched him click "yes" on the computer, and assented on behalf of the client, to Mr. Walsh proceeding and clicking "yes" to accept the license agreement. Had Ms. Larios not assented to the license agreement, it would have been

---

[15] Defendant's Composite Ex. "2."

impossible for Mr. Walsh to have circumvented the EULA to install the software, perform the initial set up, and conduct the extensive training on the program. There was no testimony or other evidence of record presented by the Plaintiff that refuted Mr. Walsh's testimony that he explained the EULA to Ms. Larios and only proceeded to click "yes" after she agreed.[16]

Because there was no evidence offered disputing that the EULA was accepted by Ms. Larios, when she authorized Mr. Walsh to click "yes," the only remaining issue as to whether the EULA is enforceable is whether the conduct of Ms. Larios, as the office manager, is binding on the Plaintiff. For several reasons, the Court concludes that the EULA was accepted by the Plaintiff and become binding on the Plaintiff when Ms. Larios assented to Mr. Walsh clicking "yes" to accept the EULA.

The conduct of Ms. Larios is binding upon and imputed to the Plaintiff. Ms. Larios was designated by the Plaintiff as the employee who had the duty of serving as the primary point person to sit and review with Mr. Walsh, the software installation and the training. More importantly, Ms. Larios initialed each of the appropriate pages of the training manual, which the customer was required to acknowledge, and signed the documentation the customer was required to sign acknowledging that the software had been installed and that the license had been accepted on behalf of the customer. Whether Dr. Im in his own mind subjectively believed that Ms. Larios was authorized to do so is largely irrelevant, because "[A]n agent's actual authority is grounded in the principal's manifestations (however indirect) to the agent, not the principal's

---

[16] While Dr. Im testified that he made all "executive decisions" on behalf of the Plaintiff corporation, he did not provide any testimony which contradicted the testimony of Mr. Walsh on this issue.

10

unexpressed will, mental state, or unknown wishes."[17] A party that authorizes an agent to perform an act may impliedly authorize the agent to enter into a click agreement on its behalf as part of the performance of the authorized act.[18] The key inquiry is whether Ms. Larios's consent to the EULA was "necessary, usual, and proper to accomplish or perform" her responsibilities as Plaintiff's office manager.[19] "Lack of actual authority is established by showing either that the agent did not believe, or could not reasonably have believed, that the principal's grant of actual authority encompassed the act in question."[20]

Dr. Im's own testimony was more than sufficient to establish that Ms. Larios's actions during the installation of the ProtoMed Software were "necessary, usual, and proper to . . . achieve the [Plaintiff's] objectives."[21] Dr. Im admitted in his testimony that Ms. Larios' duties, as the office manager, primarily involved being in charge of Plaintiff's billing procedures. Dr. Im testified that as the primary person in charge of billing, Ms. Larios had authority to pay Plaintiff's bills, including the authority to sign checks on

---

[17] RESTATEMENT (THIRD) OF AGENCY § 2.01 cmt. c (2006) ("An agent's actual authority is grounded in the principal's manifestations (however indirect) to the agent, not the principal's unexpressed will, mental state, or unknown wishes.").

[18] *See* Siebert v. Amateur Athletic Union of the U.S., Inc., 422 F. Supp. 2d 1033, 1039 (D. Minn. 2006); *see also* Hofer v. Gap, Inc., 516 F. Supp. 2d 161, 175 (D. Mass. 2007) (finding an agent's acceptance of the terms of a disclaimer when booking an airline ticket online for the principal was "an act incidental to the transaction" the agent was authorized to do); Recursion Software, Inc. v. Interactive Intelligence, Inc., 425 F. Supp. 2d 756, 783 (N.D. Tex. 2006) (finding that where installation of software without assent to terms is impossible, claim that plaintiff did not see or read terms is without merit).

[19] RESTATEMENT (THIRD) OF AGENCY § 2.01 cmt. b.

[20] Id. § 2.02 cmt. e.

[21] Id. § 2.01 cmt. b.

behalf of the corporation. Indeed, according to Dr. Im, Ms. Larios was likely the person who wrote and signed the check to pay for the ProtoMed Software.

In addition to the fact that Ms. Larios had broad authority as the office manager to supervise billing, pay bills and sign checks, Ms. Larios was assigned the responsibility for physically being with Mr. Walsh to supervise installation of the software and to receive the training for using the ProtoMed Software. The designation of Ms. Larios as the "point person" for the installation and training makes sense in view of the fact that Dr. Im's primary reason for purchasing the software was to help expedite Plaintiff's billing practices – an area in which Dr. Im placed Ms. Larios in charge as the office manager.

Further, from the perspective of the licensor, Mr. Walsh testified that Ms. Larios was designated by the customer as the "go to" person with respect to getting the software up and running in Plaintiff's office.[22] Over the course of the three days that Mr. Walsh set up the software and trained Dr. Im's staff, Ms. Larios was present throughout the entire process and was the only person who signed the training workbook acknowledging the training and instruction which had been covered each day.[23] Notably, Dr. Im testified that Ms. Larios had the authority to sign the daily training progress sheets on behalf of the Plaintiff.

In an agency relationship, as here, where the principal expresses to the agent his "wish that something be done, it is natural to assume that the principal wishes, as an

---

[22] *See also* ProtoMed's Training Workbook (Oct. 10 - Oct. 12, 2006), Defendant's Exhibit #2.

[23] *See* id.

incidental matter, that the agent take the steps necessary and that the agent proceed in the usual and ordinary way . . . unless the principal directs otherwise."[24] There was no testimony that Dr. Im advised Mr. Walsh that Ms. Larios' authority was limited in any way with regard to the installation and training for the software. Certainly, when Dr. Im instructed Ms. Larios to be the point person for the office during the installation and training by Mr. Walsh, it is more than reasonable to assume that Ms. Larios would need to make decisions with regard to the installation of the software.

There was no evidence presented by Dr. Im that Ms. Larios would not, as the office manager, be entitled to acknowledge the installation of the software and acknowledge that the training had been provided. Indeed, Dr. Im testified that he did not discuss the EULA with Ms. Larios at any time prior to or after the ProtoMed Software had been installed.

Accordingly, the evidence presented by the parties demonstrates that Ms. Larios's assent to the EULA was necessary and incidental to her duties and responsibilities as Plaintiff's office manager and as the person designated by the Exceptional Urgent Care to have primary responsibility for working with Mr. Walsh during the installation and during the training. Thus, the Court concludes that Ms. Larios had actual authority to accept the EULA on Plaintiff's behalf and to bind the Plaintiff to the terms of the EULA.

---

[24] RESTATEMENT (THIRD) OF AGENCY § 2.02 cmt. d (2006).

Alternatively, even if Ms. Larios did not have actual authority to bind Plaintiff to the EULA, the Plaintiff's subsequent continuous use of the software for approximately sixteen months constituted ratification of her "unauthorized act."

An agent's assent to the terms of a click agreement is binding on the principal party whether or not the agent reads the agreement and even if the agent is not authorized to bind the principal where the principal ratifies the agreement through conduct (such as continuing to use the software after acquiring knowledge of the agreement).[25] "Ratification is the adoption or confirmation by a principal of an unauthorized act performed on its behalf by an agent."[26] An example of ratification includes retaining the benefits of the agreement.[27]

Plaintiff attempts to avoid the fact that it used the software continuously for sixteen months and accepted the benefits of the license during that time period by arguing that because Dr. Im was not aware of the EULA until April 2008, he could not have knowingly ratified the license. This argument ignores the rule that a principal cannot shield itself from liability to a third party by claiming not to have actual knowledge of material facts that are directly related to a transaction it entrusted to its agent.[28]

---

[25] Mortgage Plus, Inc. v. DocMagic, Inc., No. 03-2582-GTV-DJW, 2004 WL 2331918, at *6 (D. Kan. Aug. 23, 2004).

[26] Id.

[27] Id.

[28] Computel, Inc. v. Emery Air Freight Corp., 919 F.2d 678, 685 (11th Cir. 1990).

Whatever knowledge an agent acquires within the scope of its authority is imputed to the principal.[29]

There was no dispute that Mr. Walsh told Ms. Larios about the EULA and told her that a copy of it was contained in the software, located in the help menu. After the installation of the software, Ms. Larios served as Plaintiff's point of contact with Defendant. According to Dr. Im, part of Ms. Larios's duties as the office manager was to keep a file of all correspondence Plaintiff received from Defendant. Therefore, not only did Ms. Larios know that the EULA existed and was readily accessible to Plaintiff every time the software was accessed, but she was fully aware that the Plaintiff was required to pay an annual fee for the license. Accordingly, because the knowledge gained by Ms. Larios is imputed to the Plaintiff even if Dr. Im did not personally learn of all of the terms of the EULA until April 2008, the continued use by Exceptional Urgent Care of the ProtoMed Software over the course of sixteen months (without objection) is, nonetheless, a ratification of the license agreement. Plaintiff cannot disavow the burdens of an agreement where it has affirmatively accepted the agreement's benefits.[30] To hold otherwise would make the enforcement of software license agreements largely illusory. A software user would be free to use software indiscriminately and when it was required to pay according to the terms of use in the EULA, simply avoid payment by asserting that its chief executive officer never read the EULA. That is inconsistent with all basic notions of contract law and therefore where, as here, software is used by a

---

[29] Id.

[30] Computel, Inc., 919 F.2d at 685; *see also* Burcham v. Expedia, Inc., No. 4:07CV1963-CDP, 2009 WL 586513, at *3-4 (E.D. Mo. Mar. 6, 2009) (enforcing forum selection clause against a website user that did not see the website's terms of use but accepted the benefits of the website's services).

15

customer, and a responsible agent of the customer is aware of the EULA, the EULA is binding and enforceable, notwithstanding whether the CEO or president of the corporate entity has ever read the EULA.

Accordingly, because the Court concludes that the EULA is binding on the parties the forum selection clause contained in the EULA, which the Defendant seeks to enforce in this case, is also binding and enforceable.

### C. *Analysis Under § 1404(a)*

Having found the forum selection clause is valid and enforceable, the Court still must consider under a traditional § 1404(a) analysis whether venue should be transferred.

As a preliminary matter, neither party disputes that the District Court for the District of Maryland would be a proper venue for this action in view of the fact that Defendant is a Maryland corporation with its principal place of business in Linthicum, Maryland.[31]

Pursuant to 28 U.S.C. § 1404(a) in determining whether to grant a motion to transfer venue, the Court should "balance a number of case-specific factors."[32] The burden falls on the movant to establish that the suggested forum is more convenient. However, where the parties have entered into a valid and *exclusive* forum selection clause, the burden shifts to the party opposing the transfer to "persuad[e] the court that

---

[31] 28 U.S.C. § 1391(a)(2)("Venue is proper in the judicial district where any defendant resides.")

[32] Stewart Org., Inc. v Ricoh Corp., 487 U.S. 22, 29 (1988); Such factors include: "(1) Plaintiff's choice of forum; (2) the convenience for the witnesses; (3) the accessibility of witnesses and other sources of proof; (4) the possibility of obtaining a fair trial; and (5) all other practical considerations that make trial expeditious and economical." Mortgage Plus, Inc., 2004 WL 2331918, at *6 (citing Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509 (10th Cir. 1991)).

the contractual forum is sufficiently inconvenient to justify retention of the dispute."[33] The Court's analysis, then, turns on whether the forum selection clause is "exclusive" or "permissive."

A permissive forum selection clause allows parties to consent to personal jurisdiction in a designated forum but its language does not bind the parties to litigate there.[34] In contrast, an exclusive—or mandatory—clause mandates that litigation under the contract must occur in a particular forum.[35] Mandatory forum selection clauses must be clear, unequivocal and contain language of exclusivity.[36] In the instant case, the forum selection clause in the Agreement provides:

> This EULA and performance under this EULA shall be governed by the laws of the State of Maryland . . . EXCLUSIVE VENUE FOR ALL DISPUTES ARISING OUT OF OR RELATING TO THE AGREEMENT SHALL BE THE STATE AND FEDERAL COURTS IN BALTIMORE CITY, MARYLAND, AND EACH PARTY IRREVOCABLY CONSENTS TO SUCH PERSONAL JURISDICTION AND WAIVES ALL OBJECTIONS THERETO.[37]

Based on this language there can be no real dispute that the forum selection clause here is mandatory. The forum selection clause appears in all capital letters and clearly states that Maryland "shall" be the "exclusive" venue. To be sure that the forum selection clause is mandatory, the Plaintiff did not argue in its opposition, nor did it contend at the hearing, that the forum selection clause is not mandatory. The Court

---

[33] Stewart Org., Inc., 487 U.S. at 29.

[34] Global Satellite Comm'n Co. v. Starmill U.K., Ltd., 378 F.3d 1269, 1272 (11th Cir. 2004); Snapper, Inc. v. Redan, 171 F.3d 1249, 1262 n.24 (11th Cir. 1999).

[35] Global Satellite Comm'n Co., 378 F.3d at 1272.

[36] Id.

[37] EULA ¶ 9, Doc. 5 p. 27 (emphasis in original).

therefore readily concludes that the forum selection clause in the EULA in this case is mandatory.

Where a forum selection clause is mandatory, as opposed to permissive, "[t]he venue mandated by a choice of forum clause rarely will be outweighed by other § 1404(a) factors."[38] In other words, unless the forum designated by the forum selection clause would be so unreasonable, unfair or inconvenient as to effectively deprive Plaintiff of its day in court, it is only in the most rare and exceptional cases that the Court will decline to enforce the forum selection clause.[39]

This is not such a rare and exceptional case in which the Court should refuse to enforce a forum selection clause. Indeed, the only argument offered by Plaintiff on the issue of fairness is that it will cost Plaintiff more to litigate this matter in Maryland. While this may be so the fact that it will cost Plaintiff more to litigate this matter in Maryland is not alone a sufficient reason to invalidate the forum selection clause.[40] Maryland is not a "remote alien forum" chosen to discourage claims – it is simply a forum with a strong connection to one of the parties – the Defendant.

### D. *The Forum Selection Clause Encompasses Plaintiff's FDUTPA Claim*

At the time of the hearing, Plaintiff had not asserted a FDUPTA claim. Apparently recognizing after the hearing that the motion to transfer venue was going to be granted, Plaintiff filed a First Amended Complaint containing a third count alleging that

---

[38] Stewart Org., Inc., 487 U.S. at 33.

[39] M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972); Lipcon v. Underwriters at Lloyd's, London, 148 F. 3d 1285 (11th Cir. 1998).

[40] Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585 (1991); P & S Bus. Mach, Inc. v. Canon USA, Inc., 331 F.3d 804, 807-08 (11th Cir. 2003).

Defendant's conduct violated FDUPTA[41] and asserting that the forum selection clause does not apply to violations of FDUPTA.[42] Plaintiff's assertion that the forum selection clause does not apply to the FDUPTA claim is due to be rejected.

The forum selection clause by its express language applies to "all disputes arising out of or relating to the [EULA]."[43] The EULA governs the relationship between Plaintiff and Defendant. Plaintiff's claims in this case - including its claims under FDUPTA - focus on Plaintiff's assertion that the ProtoMed Software did not work as promised. Whether couched in terms of breach of warranty, breach of contract or misrepresentation all of the claims in this case stem from the Defendant's license of the software to the Plaintiff. The Eleventh Circuit broadly construes forum selection clauses, like the one involved in this case, to apply to "all causes of action arising directly or indirectly from the business relationship evidenced by the contract" whether the claims are contractual, extra-contractual, and/or tortious.[44]

Accordingly, because the forum selection clause in the EULA in this case is sufficiently broad to encompass "all disputes arising out or relating to" the license of the software, Plaintiff's claims for breach of oral contract, breach of warranty, and unfair and deceptive trade practices are covered by the forum selection clause and, as such, Plaintiff's amendment of its complaint does not prevent the enforcement of the forum

---

[41] Chapter 501, Florida Statutes.

[42] *See* Plaintiff's First Amended Complaint, Doc. 29 ¶¶ 30-35.

[43] EULA ¶ 9, Doc. 5 p. 27.

[44] Stewart Org., Inc., 810 F.2d at 1070.

selection clause.[45] For these reasons, Defendant's request that the Court transfer this action under § 1404(a) is due to be **GRANTED**.

### III. RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's Motion to Dismiss should be **DENIED**, Defendant's Motion to Transfer Venue should be **GRANTED** (Doc. 7) and this action should be transferred to the United States District Court for the District of Maryland.

**IN CHAMBERS** in Ocala, Florida, on June 15, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:
The Honorable Wm. Terrell Hodges
Senior United States District Judge

Counsel of Record

---

[45] Id.; see also Pods, Inc. v. Paysource, Inc., No. 8:05-cv-1764-T-27EAJ, 2006 WL 1382099, at *2 (M.D. Fla. May 19, 2006) (enforcing a forum selection clause while noting that commercial litigation often involves a combination of contractual, tort, criminal and/or antitrust issues).